No. 23-1042
_____

In the
UNITED STATES COURT OF APPEALS
for the EIGHTH CIRCUIT
_____

**SARAH FELTS,**
Plaintiff/Appellee,

v.

**MEGAN E. GREEN, in her official capacity as President of the Board of Aldermen of the City of St. Louis,**
Defendant/Appellant.
_____

Addendum to Appellants' Brief

Contents

1.    Findings of fact, conclusions of law and order *Felts v. Vollmer,*

      Case No. 20-CV-00821-JAR ………………………….……… A-0001

Respectfully Submitted,

SHEENA HAMILTON
City Counselor

*/s/Brandon Laird*
Brandon Laird (Mo. 65564)
Associate City Counselor
City Hall
1200 Market St., Rm. 314
St. Louis, MO 63103
Tel: (314)622-3361
Fax:   (314) 622-4956
lairdb@stlouis-mo.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH FELTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-CV-00821 JAR |
| | ) | |
| JOSEPH VOLLMER, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

On June 23, 2020, Plaintiff Sarah Felts filed this action pursuant to 42 U.S.C. § 1983 against Lewis Reed in his official capacity as President of the St. Louis Board of Aldermen alleging he violated her First Amendment rights by blocking her from his Twitter account in an act of viewpoint discrimination in a designated public forum. (Doc. No. 1). Plaintiff requested declaratory and injunctive relief, as well as nominal damages. The parties filed cross-motions for summary judgment (Doc. Nos. 75, 79), which the Court denied, concluding that a question of fact existed as to whether Reed operated his Twitter account in his personal or official capacity (Doc. No. 101).

On June 7, 2022, Reed resigned as President of the Board of Aldermen for reasons unrelated to this action, and Interim-President Joseph Vollmer was substituted for Reed pursuant to Fed. R. Civ. P. 25(d). Vollmer then moved to dismiss this matter, arguing Plaintiff's claims against him were moot in light of Reed's resignation. The Court dismissed Plaintiff's claim to the extent it requested injunctive relief as moot, but declined to dismiss Plaintiff's claim for declaratory relief, nominal damages, costs, and attorneys' fees. (Doc. No. 127).

1

A-001

The case proceeded as a bench trial on the merits on June 29, 2022. Plaintiff appeared in person and by counsel Lisa Hoppenjans, Tobin Raju, Molly Carney, Emily Lazaroff, Jessie Steffan, and Anthony Rothert; Vollmer appeared by counsel Steven Kratky. Evidence and testimony were adduced.

Reed appeared at trial with counsel and, when called to testify, invoked the Fifth Amendment.[1] Rather than having Reed invoke the Fifth Amendment to a series of Plaintiff's questions at trial, the Court, with the agreement of counsel, directed Plaintiff to submit a list of questions she intended to ask Reed after the trial was concluded. (Doc. Nos. 139, 143). The Court also directed Vollmer to submit his proposed designations of Reed's deposition and a memorandum in support of their admissibility and the admissibility of Reed's affidavit. (Id., Doc. No. 145). Plaintiff objected to the admissibility of Vollmer's deposition designations and Reed objected to each of the questions Plaintiff intended to pose to him. Defendant did not submit any memorandum in support of the admissibility of Reed's affidavit. The Court reserved ruling on the parties' objections and included Reed's deposition designations, Plaintiff's counter-designations, and Plaintiff's questions to Reed in the trial record. (Doc. No. 155). The Court then directed the parties to file proposed findings of fact and conclusions of law within thirty days. (Id.). A transcript was prepared and has been made part of the record in this case. (Trial Transcript ("Trial Tr."), Doc. No. 154).

---

[1] Reed answered four preliminary questions, confirming that he was attending trial pursuant to a subpoena; that he was first elected President of the Board of Aldermen in 2007 and took office that year; and that he vacated the office in June of 2022. (Tr. Transcript, Doc. No. 154 at 104:15-23; 105:1-3). At that point, Reed had a brief discussion off the record with his attorney and invoked the Fifth Amendment in response to Plaintiff's questions. Reed indicated he would exercise his rights under the Fifth Amendment in response to any and all questions that he would be asked both by Plaintiff's counsel and counsel on behalf of the City. (Id. at 108:15-109:6). The Court then excused Reed.

On September 6, 2022, the parties submitted their proposed findings of fact and conclusions of law. (Doc. Nos. 158, 159). Having considered the arguments and evidence in the trial record as well as the proposed findings of fact and conclusions of law submitted by the parties, the Court enters judgment in Plaintiff's favor.

## **FINDINGS OF FACT**

As a threshold matter, the Court draws no adverse inference from Reed's invocation of the Fifth Amendment at trial. Reed testified extensively in three depositions prior to trial and the Court finds no basis for concluding that if he had chosen to respond to Plaintiff's questions at trial – many of which are repetitive and duplicative of the parties' stipulated facts – his answers would have adduced any new evidence. Reed's decision to invoke the Fifth Amendment upon the advice of counsel appears to be associated with a separate criminal investigation unrelated to the facts of this case. Under these unique circumstances, the Court has made the appropriate inferences based on the record evidence.

1.     Plaintiff Sarah Felts is a City of St. Louis resident and political activist. She has a personal Twitter account with the handle @SarahFelts ("Plaintiff's Account"). (Joint Stipulation of Fact ("Joint Stip."), Doc. No. 115 at ¶¶ 1-2, 105).

2.     Lewis Reed was the elected President of the St. Louis City Board of Aldermen from 2007 until he resigned on June 7, 2022. (Joint Stip. at ¶ 4).

3.     Twitter is a social media platform. Twitter users may publish short messages called "tweets." Users may also "retweet," i.e., publish another user's tweet on their own account, with the option to add their own commentary, and comment on tweets by users with public profiles. (Joint Stip. at ¶¶ 19-21; Pltf.'s Exs. 5, 7-9).

A-003

4.      Twitter users have unique usernames, or "handles," that identify the account and differentiate the account from other accounts. (Joint Stip. at ¶ 24). A Twitter user may "tag" another user by including the other user's handle in their own tweet. The mentioned user will receive a notification that the mentioning user is attempting to engage them in dialogue and provide a link to the tagged user's profile. (Joint Stip. at ¶ 34).

5.      A Twitter user may make their profile public or private. A private profile restricts access to their page to specific users. A public profile may be accessed by any user who is not "blocked" by the owner. (Joint Stip. at ¶¶ 32-33). When a user is blocked from a public profile, they cannot see the account, reply to tweets, or participate in comment threads under the account. (Joint Stip. at ¶ 43).

6.      In March 2009, Reed created a public Twitter account (the "Account") to "put out information for people to … let them know what I'm up to." (Joint Stip. at ¶¶ 44-45). At times, Reed changed the Account's handle to indicate his candidacy for office, but between March 2009 and June of 2020, the most frequently used handle was @PresReed.[2] (Joint Stip. at ¶ 48).

7.      On his Twitter page, Reed described himself as "Father of 4 great kids, husband, public servant, life long democrat, proud St. Louis City resident, President of the Board of Aldermen." (Joint Stip. at ¶ 53; Pltf.'s Ex. 15).

8.      Any member of the public could view Reed's posts and either "like," reply, or "retweet" his posts. (Joint Stip. at ¶ 64).

9.      On January 26, 2019, a Twitter account with the handle @ActionSTL tweeted: "Reeds asked to clarify his position on @CLOSEWorkhouse. He says we need to rework out [sic]

---

[2] For approximately six months, from October 3, 2012 to April 7, 2013, the Account's username was "@Reed4Mayor." (Joint Stip. at ¶ 50). After Plaintiff's lawsuit was filed, between December 2, 2020 to March 3, 2021, the Account username was "@ReedForMayorSTL." (Id. at ¶ 54). In April 2021, the handle for the Account was changed to "@LewisReedSTL." (Id. at ¶ 55).

4

court system. Eventually says yes, he does support the demand to close the workhouse but we need to change the messaging around it." (Pltf.'s Ex.  27). Action St. Louis, a local, black-led advocacy organization, operates the @ActionSTL Account. (Trial Tr. at 68:19-20).

10. Plaintiff responded to Action St. Louis' tweet stating: "What do you mean by 'change the messaging around #CloseTheWorkhouse,' @PresReed? #STLBOA #aldergeddon2019 #WokeVoterSTL." (Pltf.'s Ex. 27). The issue of closing the St. Louis Workhouse, a medium security institution and one of two jails in the City, was a subject of political debate in January 2019. Plaintiff was among those advocating for the Board of Aldermen to take action to close the Workhouse, as was Action St. Louis. (Trial Tr. at 69:15-25).

11. Plaintiff believed Reed's statement, as reported by Action St. Louis, that "we need to change the messaging around closing the Workhouse" was an attempt to avoid dealing with the underlying issue. Plaintiff sent her tweet to ask Reed what he meant by "change the messaging" and signal to other Twitter users that they could reach Reed via Twitter. (Trial Tr. at 70:1- 71:9).

12. Later in the evening of January 26, 2019, Plaintiff attempted to access Reed's Twitter profile page and learned she had been blocked by Reed, meaning she could no longer view his tweets, or otherwise interact with his Account. (Joint Stip. at ¶ 52).

13. Reed blocked Plaintiff in response to her tweet asking about the Workhouse and use of the hashtag "Aldergeddon 2019," which be believed implied violence against the Board of Aldermen and himself. (Reed Depo., Vol. I at 107:20-23) ("I blocked her because she was – she had tweeted about Armageddon, right…").

14. The "#aldergeddon" reference in Plaintiff's tweet was a hashtag used by a number of verified Twitter accounts belonging to St. Louis-area journalists and elected officials to tag

content related to the Board of Aldermen. (Pltf.'s Exs. 30-42). No evidence was presented that the #aldergedden hashtag was ever associated with violence or threats of violence.

15.     Sometime in the early months of 2019, Reed issued a directive to create and/or modify the official webpage for the Office of the President of the Board of Aldermen within the City's website to include a link to the Account. (Joint Stip. at ¶ 73). By April 2019, the Account was embedded at Reed's direction in the webpage for the Office of the President of the Board of Aldermen within the website for the City of St. Louis at www.stlouis-mo.gov and included a live feed of Reed's Twitter posts. (Joint Stip. at ¶¶ 74, 79-82, 85-86). Embedding the Account required the assistance of the City's IT department. (Joint Stip. at ¶¶ 83-84). Reed's profile on the City's website included a link to the Twitter page associated with the @PresReed handle. (Joint Stip. ¶ at 87).

16.     The embedded feed of Reed's Account was removed from the City's website sometime between June 12 and June 24, 2020 – after the instant lawsuit was filed. (Trial Tr. at 34:11-24; 37:20-25).

17.     Plaintiff's Account remained blocked until sometime after she filed the instant action and before February 8, 2021. (Joint Stip. at ¶ 108).

18.     The City's Department of Personnel has a Social Media Policy (revised and reissued in May 2020) establishing rules for managing the City's official social media sites and accounts as well as for employees utilizing social media for personal use. (Doc. No. 108-2).

19.     The City's social media policy does not apply to elected officials such as Reed or to his appointed staff. (Joint Stip. at ¶¶ 58-60).

20.     Reed had final authority regarding communications, including the use of social media, on behalf of the Office of President of the Board of Aldermen for the City. (Joint Stip. at ¶ 62).

21.     During the relevant time period, the Office of the President of the Board of Aldermen had four staff members, City employees Maurice Fells, Mary Cullins, Mary Goodman, and Thomas Shepard. (Joint Stip. at ¶¶ 5-13).

22.     Both Shepard and Goodman had login credentials and authority over the Account, proposed and reviewed the content of tweets, posted tweets from the Account at Reed's direction, and created graphics for posting on the Account. (Joint Stip. at ¶¶ 66-71; Trial Tr. 112:24-114:22; Shepard Depo., Doc. No. 159-4 at 24:2-6; 30:19-31:1; 44:7-45:1 ).

23.     Nothing in the record indicates Reed used the Account to announce his candidacy for any office, solicit campaign donations, post about his campaigns, or discuss events for his political party. Rather, Reed used the Account to discuss official government business and interact with other Twitter users about that government business:

a.      On January 15, 2019, the Account tweeted: "In response to the concerns raised by St. Louis Agency on Training & Employment (SLATE) employees and for the sake of maintaining the integrity and transparency of the department, I am asking the Facilities Dept. to remove any shredding equipment from the premises of SLATE." An image of a letter to Rick Ernst, Commissioner of the Board of Public Service signed by Lewis E. Reed, President, Board of Aldermen and on President's Office letter head was attached. (Pltf.'s Ex. 15).

b.      On June 3, 2020, the Account tweeted: "I'm proud to announce the organization of the Coronavirus Special Committee of the #STLBOA. The members were selected based on their individual professional backgrounds, #COVID19 data & their ability to dedicate significant time

7

to the effort." The tweet also contained a link to the St. Louis City's COVID-19 Special Committee. (Pltf.'s Ex. 16).

   c.  On November 10, 2020, the Account sent out a tweet which tagged Governor Mike Parson's Twitter account and included a link a KSDK News report indicating that roughly $1 billion in federal virus aid is unspent in Missouri. The tweet stated "@STLCityGov will gladly help spend some of this aid! We've got many places that are in need of funds & have been hard hit bc of #Covid…." (Pltf.'s Ex. 17).

   d.  On May 7, 2021 the Account made several tweets about the City's Annual Budget. The Account noted that "The Ways & Means Committee will hold several public hearings and opportunities for public comments in the coming weeks." and "I'm encouraging everyone to be a part of this process as the bill is in cmt. I want this budget to reflect the wants & needs of the residents." (Pltf.'s Ex. 18). Introducing budget bills is part of Reed's former role as President of the Board of Aldermen. (Reed Depo., Vol. I at 79:3-10). Reed pledged during his campaign "to encourage more people to be part of the budget process." (Id. at 80:6-8).

   e.  On June 30, 2021 the Account tweeted "Join #STLBOA tonight at 4 p.m. to voice how you want the American Recovery Act funds spent in the city. If you own a city business or nonprofit, we want to hear from you!" (Pltf.'s Ex. 19).

   f.  On July 16, 2021, the Account tweeted "Today, the Comptroller & the Mayor failed the people of the City of St. Louis by not seconding my motion to approve a bill to provide necessary funding to the people to help recover from the pandemic. The Board of Aldermen did their job. It's time for E&A to do the same." The tweet included an image of a document on President's Office letterhead in support of the bill. (Pltf.'s Ex. 20).

g.      On July 30, 2021 the Account tweeted "Today, myself alongside members of #STLBOA shared a legal opinion stating that if Board Bill 2 is enacted in its current state it would NOT violate the federal treasury guidelines." The tweet included a link to a video of the press conference and two images of a letter directed to Lewis E. Reed, President, City of St. Louis Board of Aldermen from a law firm about the proposed legislation. (Pltf.'s Ex. 21).

h.      On March 21, 2020, the Account tweeted: "I've spent most of my day speaking with MO House Reps & State Senators discussing ways to help our City residents & businesses during these difficult times. I will continue to work with them, [the Mayor of St. Louis City], fellow #STLBOA members & the Governor to address our needs." An image of a letter directed to the Board of Aldermen from Reed on President's Office letterhead is attached. In the letter, Reed "recommend[s] each of you communicate with your constituents through you eblasts, Facebook Live, Twitter, Instagram, Nextdoor by mail or even host your own virtual ward meeting." (Pltf.'s Exs. 22-23).

i.      On April 13, 2021, the Account tweeted: "Today, my office along with [the Mayor of St. Louis City] @STLFireDept @WomensVoicesSTL announced a new partnership with "Lock it for Love" to provide free gun locks to anyone who needs one at all 30 fire stations - NO QUESTIONS ASKED!" (Pltf.'s Ex. 24).

j.      On August 16, 2021, the Account tweeted an image of press release on President's Office letter head titled "Board of Aldermen President Lewis Reed response to Mayor Jones' line item veto of North St. Louis Covid relief funds." (Pltf.'s Ex. 25).

k.      On June 8, 2020, the Account tweeted "Today, I filed legislation to update the current @SLMPD Use of Force Policy," and described Board Bill 63. (Plaintiff's Exhibit 43).

9

Reed testified that regulating the police's use of force was part of his campaign pledge. (Reed Depo., Vol. I at 76:2-8).

## CONCLUSIONS OF LAW

24.     Plaintiff seeks a declaration that Reed, in his official capacity as President of the Board of Aldermen, violated her First and Fourteenth Amendment rights by blocking her from his Twitter account in an act of viewpoint discrimination in a designated public forum. She seeks nominal damages, costs, and attorney's fees.

25.     The Court previously dismissed Plaintiff's claim for injunctive relief as moot in light of the parties' stipulation that Reed unblocked Plaintiff after she filed her complaint and Reed's subsequent resignation. (Doc. No. 127). Reed's resignation does not, however, moot Plaintiff's claims for declaratory relief and nominal damages. See Abdullah v. Cty. of St. Louis, Mo., 52 F. Supp. 3d 936, 947 (E.D. Mo. 2014) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."); Uzuegbunam v. Preczewski, 141 S. Ct. 792, 802 (2021) ("[N]ominal damages provide the necessary redress for a completed violation of a legal right.").

26.     Section 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the Constitution and laws of the United States. Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982)); see also Yassin v. Weyker, 39 F.4th 1086, 1089 (8th Cir. 2022).

27.     By suing Reed in his official capacity only, the City is the actual defendant in this case. See Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 n.55 (1978). Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from an "official

A-010

municipal policy," Mitchell v. Kirchmeier, 28 F.4th 888, 899 (8th Cir. 2022) (quoting Ware v. Jackson Cnty., 150 F.3d 873, 880 (8th Cir. 1998)), or the policy of a policymaker acting under color of state law, see Pembaur v. City of Cincinnati, 475 U.S. 469, 480-83 (1986) (plurality).

28.      A single incident of unconstitutional activity can establish the requisite municipal policy, so long as the decision is made by the highest officials responsible for setting policy in that area of the government's business. City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (plurality); Rynders v. Williams, 650 F.3d 1188, 1195 (8th Cir. 2011). It is not necessary that the decisionmaker intended the decision to apply to a wide range of situations; rather, even a single decision tailored to a particular situation may qualify as an official government policy for purposes of establishing municipal liability under § 1983. Pembaur , 475 U.S. at 481.

29.      The Court previously determined that Reed, as President of the Board of Aldermen, was the final decisionmaker for communications for the Office of President. (Doc. No. 101 at 9; see also Joint Stip. at ¶ 62). Nothing in the record causes the Court to reconsider its prior determination. Although State law says very little about the affirmative powers of the President of the Board of Aldermen, the City Charter Art. IV. Section 3 and Revised City Code Section 3.06 make it clear that the President is vested with inherent authority over the affairs of the President's Office. See Robinson v. Hunt Cty., 921 F.3d 440, 448-49 (5th Cir. 2019) (finding the authority to operate a sheriff's office's social media page "derives from [the sheriff's] elected position, not by virtue of delegation"). Further, there are no policies, rules, regulations, or customs which apply to the Office of the President's social media usage. The Court therefore concludes that Reed, in his official capacity, was the final policymaker for communications, including the use of social media, for the Office of President of the Board of Aldermen for the City. As such, his decision to block Plaintiff from the Account constituted the requisite policy for purposes of Monell liability.

30.     In a § 1983 action, whether a defendant acted under color of state law concerns whether the challenged conduct is "fairly attributable to the State." Yassin, 39 F.4th at 1090 (quoting Montano v. Hedgepeth, 120 F.3d 844, 848 (8th Cir. 1997)). To determine if it is, the focus is on the "nature and circumstances of the [defendant]'s conduct and the relationship of that conduct to the performance of [his] official duties." Id. (quoting Magee v. Trs. of Hamline Univ., Minn., 747 F.3d 532, 535 (8th Cir. 2014)). "The [color of law] element is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses power." Johnson v. Phillips, 664 F.3d 232, 240 (8th Cir. 2011).

31.     When administering a social media account, a government official acts under color of state law when "the page is clothed in the 'power and prestige of [his] state office' and administered 'to perform actual or apparent duties of [his] office." Davison v. Randall, 912 F.3d 666, 680-81 (4th Cir. 2019).

32.     In Davison, 912 F.3d 666, for example, the Fourth Circuit held that the Chair of the Loudoun County, Virginia, Board of Supervisors acted under color of state law and violated the First Amendment when she banned a constituent from the "Chair Phyllis J. Randall" Facebook page she created the day before she took office. Id. at 672-73. Randall's posts to her "governmental official" Facebook page dealt with numerous aspects of her official responsibilities, including posting "to notify the public about upcoming Loudoun Board meetings, and the subjects to be discussed during those meetings," "to inform Loudoun County residents about significant public safety issues," and "to communicate with constituents regarding which municipal streets required plowing" following a large snowstorm. Id. at 673-74. In addition, Randall used her page to invite members of the public to participate in certain constituent commissions and "to advise the public regarding official actions taken by the Loudoun Board." Id. at 674. The Davison court also noted

12

that Randall identified herself as a "government official" on the page and listed her official county email address in the page's contact information. Id.

The Davison court concluded that Randall's "purportedly private actions" bore a "sufficiently close nexus" with the Board of Supervisors "to satisfy Section 1983's color-of-law requirement." Id. at 680 (internal quotation omitted). The court emphasized that Randall's actions were "linked to events which arose out of [her] official status," and stressed that she "used the Chair's Facebook Page 'as a tool of governance' " by providing information to the public about the Board's official activities, soliciting input from constituents on policy issues, and keeping the public informed about public safety issues. Id. Moreover, by listing her title and official contact information and categorizing the page as that of a "government official," Randall "swathe[d] the" page "in the trappings of her office." Id. at 680-81 (quotation omitted). The Fourth Circuit concluded that because Randall "clothed the Chair's Facebook Page in 'the power and prestige of h[er] state office' " and administered the page to "perform[ ] actual or apparent dut[ies] of h[er] office," a "private citizen could not have created and used" the page in the same manner that she did. Id. at 681.

33.     The Second Circuit conducted a similar analysis in Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226 (2d Cir. 2019). Knight held that the President acted in a governmental capacity when he blocked followers of his Twitter account because they posted Tweets critical of him and his policies. Id. at 234-36. The court stressed the "substantial and pervasive government involvement with, and control over," the President's Twitter account, and emphasized that the account was "presented by the President" as "belonging to, and operated by, the President" and was registered to "Donald J. Trump, '45th President of the United States of America, Washington, D.C.' " Id. Knight further explained that the President had used his Twitter

account "as a channel for communicating and interacting with the public about his administration," including to announce "matters related to official government business," "to engage with foreign leaders," and "to announce foreign policy decisions and initiatives." Id. at 235-36. The account's "like," "retweet," and "reply" functions also helped the President "to understand and to evaluate the public's reaction to what he says and does." Id. at 236.

Altogether, the Knight court determined, these facts established that the account was "an important tool of governance and executive outreach," and therefore that the evidence of "the public, non-private nature of the Account" was "overwhelming." Id. The court also acknowledged that "not every social media account operated by a public official is a government account," and instructed that courts should look to "how the official describes and uses the account," "to whom features of the account are made available," and "how others ... regard and treat the account." Id.

34.     Applying the approach adopted in Davison and Knight, the Eighth Circuit in Campbell v. Reisch, 986 F.3d 822 (8th Cir. 2021), concluded that Missouri state representative Cheri Toalson Reisch was not acting under color of state law when she blocked a constituent from her Twitter account. Id. at 823. The court reasoned that Reisch created her Twitter account "when she announced her candidacy for state representative" and that, after taking office, Reisch continued to run the Twitter account "in a private capacity, namely, as a campaigner for political office" rather than as a public official. Id. at 823-25. The Reisch court noted that although a "private account can turn into a governmental one if it becomes an organ of official business, ... that is not what happened here." Id. at 826. Reisch "used [the account] overwhelmingly for campaign purposes." Id. The posts "frequently harkened back to promises she made on the campaign trail, and [ ] touted her success in fulfilling those promises and in her performance as a legislator." Id. Although the posts occasionally "provide[d] updates on where certain bills were in

14

the legislative process or the effect certain recently enacted laws had on the state," the <u>Reisch</u> court concluded that "sporadic engagement in these activities does not overshadow what we believe was quite clearly an effort to emphasize [the defendant's] suitability for public office." <u>Id</u>. at 826–27 (internal citations omitted).

35.      The Court acknowledges, as did the Second Circuit in <u>Knight</u>, that not every social media account operated by a public official is a government account. That said, the essential character of a Twitter account is not fixed forever; it can turn into a governmental account if it becomes "an organ of official business."  <u>Reisch</u>, 986 F.3d at 826. Based on the record before it and applicable law, the Court concludes that Reed administered the Account under color of state law as an official governmental account.

36.      Reed created the Account in 2009 with the handle @PresReed, a reference to the elected office he held. According to Reed, he typically used the account to "put out information for people to … let them know what I'm up to." While Reed changed the handle at times to indicate his candidacy for office, unlike in <u>Reisch</u>, there is no evidence in the record of tweets from the Account reflecting a campaign use or that the Account was primarily used to communicate with friends and family as Reed asserted.

37.      In 2019, with the use of City resources, Reed had the Account embedded within the City's website, similar to those of other elected City officials. Reed's profile on the City's website was then linked to the Account, which included a live feed of his Twitter posts. Whether or not the Account was private at the time it was created in 2009, by the time it was embedded within the City's website, the Account had clearly evolved into a "tool of governance." The record demonstrates that Reed used the Account to issue press releases from his office; inform constituents about the introduction of bills to the Board of Aldermen; communicate with other

government officials; solicit information from the public, inform his constituents of official matters; inform the public about important health and safety concerns in the City; and interact and engage with constituents regarding official policies.

38.     The Account also bore certain "trappings" of Reed's office. The Account included a link directing visitors to the webpage for the Office of the President of the Board of Aldermen, which in turn provided access to Reed's official contact information, links to the City's website, and posts about official activities. See Knight, 928 F.3d at 231; Davison, 912 F.3d at 683.

39.     Reed used City resources to operate and support the Account. City employees over whom Reed had supervisory authority had login credentials and authority over the Account, proposed and reviewed the content of tweets, posted tweets from the Account at Reed's direction, and created graphics to be posted on the Account. While some of Reed's staff also volunteered on his mayoral campaigns, no clear lines were drawn between their time spent as campaign volunteers or as City employees. (Trial Tr. at 120:25-121:2; 122:9-12; 129:10-17). In any event, Reed's staff were clearly utilizing City resources to operate the Account, including working with the City's IT department and web resources to set up a webpage for the President's Office that included an embedded live feed of the Account on the City's webpage. Davison, 912 F.3d at 675 (noting Chair Randall's official social media page was publicized in a newsletter prepared by county employees, hosted on the county's website, and distributed to county citizens via an official email account); Knight, 928 F.3d at 235 ("The President utilizes White House staff to post tweets and to maintain the Account."); Lindke v. Freed, 37 F.4th 1199, 1205-06 (6th Cir. 2022) (court noted it might find Freed used governmental resources "if [his] employees designed graphics specifically for the page and no other use").

40.     In sum, Reed maintained the Account as an elected official, used government resources – including City employees and web resources – to operate the Account, and administered the Account as a tool of governance to further his duties as Aldermanic President. As a result, Reed acted under color of state law and his actions are "fairly attributable" to the City. Davison, 912 F.3d at 680; Knight, 928 F.3d at 236.

41.     Where, as here, a government official uses a social media account for official business and the interactive portions of the account are open for public comment, the interactive component constitutes a designated public forum. See Garnier v. O'Connor-Ratcliff, 41 F.4th 1158, 1179 (9th Cir. 2022).

42.     "The government … ordinarily may not exclude speech or speakers from [a designated public] forum on the basis of viewpoint, or sometimes even on the basis of content." Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1930 (2019). See also Knight, 928 F.4d 226 at 236; Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995).

43.     It is undisputed that Plaintiff's tweet is protected speech. (See City's Proposed Findings of Fact and Conclusions of Law, Doc. No. 158 at ¶ 32). Reed contends he blocked Plaintiff because he interpreted her use of the term "aldergedden" as a threat. Although "threats of force that place a person in reasonable apprehension of bodily harm," are not protected by the First Amendment, U.S. v. Dinwiddie, 76 F.3d 913, 922 (8th Cir. 1996), the record does not suggest that Plaintiff's speech falls within this unprotected category.

44.     The nature of an alleged threat is analyzed from the viewpoint of a reasonable recipient. Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 622 (8th Cir. 2002). "[A] court must view the relevant facts to determine whether the recipient of the alleged threat could

reasonably conclude that it expresses a determination or intent to injure presently or in the future." Id. at 623 (internal quotations omitted).

45.     The #aldergeddon reference in Plaintiff's tweet was a hashtag used by journalists and elected officials to tag content related to the Board of Aldermen. It does not connote a violent intent and in no way formed a basis for Reed to block Plaintiff from the Account. See Ross v. City of Jackson, Missouri, 897 F.3d 916, 921 (8th Cir. 2018) ("[T]he context of [the defendant's] tweets was such that a reasonable recipient would not [have] interpret[ed] them as serious expressions of an intent to commit violence.") (citing State v. Metzinger, 456 S.W.3d 84, 97 (Mo. Ct. App. 2015)).

46.     "The state engages in viewpoint discrimination when the rationale for its regulation of speech is 'the specific motivating ideology or the opinion or perspective of the speaker.' " Gerlich v. Leath, 861 F.3d 697, 705 (8th Cir. 2017) (quoting Rosenberger, 515 U.S. at 829). Plaintiff learned Reed blocked her from the Account shortly after she retweeted Action St. Louis' tweet and asked Reed a critical question about his position on closing the Workhouse, a subject of political debate at the time. Reed's decision to block Plaintiff from the Account based on the content of her tweet and to continue blocking her for months while the Account was clearly being used as a tool of governance is inconsistent with the First Amendment and amounts to viewpoint discrimination.  Davison, 912 F.3d at 688. Thus, Plaintiff has established the deprivation of a constitutional right for purposes of her § 1983 claim.

47.     "[W]hatever the constitutional basis for § 1983 liability, … damages must always be designed 'to compensate injuries caused by the [constitutional] deprivation.'" Corpus v. Bennett, 430 F.3d 912, 916 (8th Cir. 2005) (quoting Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 309 (1986)). Plaintiff presents no evidence of actual damages. Nominal damages are the appropriate means "to vindicate constitutional rights whose deprivation has not caused an actual,

A-018

provable injury." Id. (quoting Westcott v. Crinklaw, 133 F.3d 658, 662 (8th Cir. 1998)). The Eighth Circuit has recognized one dollar as an appropriate value for nominal damages. Id. (citing Risdal v. Halford, 209 F.3d 1071, 1073 (8th Cir. 2000)).

48.     At all relevant times, Reed was the final decisionmaker for communications, including the use of social media, for the Office of the President of the Board of Aldermen. At or near the time Plaintiff was initially blocked, Reed's public Twitter account had evolved into a tool of governance. In any event, by the time the Account was embedded into the City's website in April 2019, while Plaintiff remained blocked, the Account was being operated by Reed under color of law as an official governmental account. The continued blocking of Plaintiff based on the content of her tweet is impermissible viewpoint discrimination in violation of the First Amendment. Thus, Plaintiff is entitled to judgment in her favor on her remaining claim for declaratory relief. The Court will also award Plaintiff the sum of $1.00 in nominal damages for the constitutional violation.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judgment is entered in favor of Plaintiff Sarah Felts and against Defendant Joseph Vollmer on Plaintiff's remaining claim for declaratory relief and nominal damages in accordance with the rulings herein. A final judgment will be entered following a determination of any claim for attorneys' fees.

**IT IS FURTHER ORDERED** that any motion for costs and fees shall be filed within fourteen (14) days of the date of this order, **up to and including December 23, 2022**. Attorney billing statements may be filed under seal, with a redacted copy of the statements filed in the public record.

Dated this 9th day of December, 2022.

_John A. Ross_

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**

20

A-020